UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-cv-80640-ALTMAN/Reinhart

JOSHUA MICHAELS,

      *Plaintiff,*

*v.*

SASSER'S GLASS WORKS INC., *et al.*,

      *Defendants.*

_____/

## ORDER

For a month between September and October 2020, our Plaintiff (Joshua Michaels) worked as a glazier for Sasser's Glass Works, alongside Jeff Johnson and Lloyd Pender (together, our three Defendants). Johnson was Michaels's supervisor, and Pender was a hiring manager. Michaels had worked with Sasser's Glass on two previous occasions over a decade ago. But this time—his first with Johnson—proved to be too much.

Michaels alleges that, during this month of employment, the Defendants discriminated against him because of his Native American heritage and because they wrongly assumed that he was black. Michaels claims that Johnson once threatened to fight him and that, when Michaels refused to fight, Johnson launched into a racist diatribe—calling him a "mountain nigger" and "chief." Some days later, Sasser's Glass asked Michaels to accept a 20% wage decrease, moved him to a separate team (where he no longer worked as a glazier), and, after Michaels quarreled with a different team member, fired him.

Michaels has sued Sasser's Glass, Johnson, and Pender in a ten-count complaint. Counts I and II of the now-operative Third Amended Complaint are Section 1981 claims for race discrimination and retaliation, respectively, against all three Defendants. *See* Third Amended Complaint ("TAC")

[ECF No. 88-1] ¶¶ 41–62. Counts III–VI are Florida Civil Rights Act ("FCRA") claims for race discrimination, national-origin discrimination, retaliation, and hostile work environment against Sasser's Glass only. *Id.* ¶¶ 63–102. And Counts VII–X are identical to Counts III–VI—except that they allege violations by Sasser's Glass of Title VII instead. *Id.* ¶¶ 103–148.

After some protracted litigation, the Defendants filed their Renewed Motion for Summary Judgment. *See generally* the Defendants' Renewed Motion for Summary Judgment ("MSJ") [ECF No. 102]. The MSJ ripened when Michaels responded, *see generally* the Plaintiff's Memorandum of Law in Response to the Defendants' Motion for Summary Judgment ("Response") [ECF No. 105], and the Defendants submitted their reply, *see generally* the Defendants' Reply Memorandum of Law in Support of the Defendants' Renewed Motion for Summary Judgment ("Reply") [ECF No. 106]. In the end, even viewing the evidence in the light most favorable to Michaels, we find that Michaels has failed to create a genuine dispute of material fact on any of his claims. We thus **GRANT** the MSJ and enter judgment against Michaels.

## THE FACTS

Before he was rehired in 2020, "Joshua Michaels . . . hadn't worked for [Sasser's Glass] since at least prior to 2005[.]" Deposition of Sheri Johnson ("Sheri Dep.") [ECF No. 104-7] at 30:13–16; *see also* Plaintiff's Response to Defendants' Statement of Facts ("Michaels's SOF") [ECF No. 104] ¶ 5 ("Undisputed.").[1] Intending to hire Michaels specifically, Johnson "asked Justin [Michaels (Joshua

---

[1] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). In considering the Defendants' MSJ, then, we describe the facts in the light most favorable to the Plaintiff—drawing mostly from the Plaintiff's evidence, except where the Defendants'

Michaels's brother)] if he knew of anybody" worth hiring and then asked Michaels "to go in and fill out an application." Sheri Dep. 14:12–15:12; *see also* Affidavit of Jeff Johnson in Support of the Defendants' Motion for Summary Judgment ("Jeff Johnson Aff.") [ECF No. 70-2] ¶ 5 ("In August 2020, I asked Plaintiff's brother, Justin Michaels, who was also an employee of [Sasser's Glass] at the time, to ask Plaintiff to work for [Sasser's Glass].");
*see also* Michaels's SOF ¶ 6 ("Undisputed.").[2] Sasser's Glass ultimately hired Michaels to work "as a glazier from September 8, 2020, to October 9, 2020." Affidavit of Sheri Sasser Johnson in Support of the Defendants' Motion for Summary Judgment ("Sheri Johnson Aff.") [ECF No. 70-1] ¶ 8; *see also* Michaels's SOF ¶ 7 ("Undisputed."). During those "four weeks" of employment, *see* Deposition of Jeff Johnson ("Johnson Dep.") [ECF No. 104-2] at 32:20, Johnson became Michaels's "supervisor," *id.* at 37:11–13; *see also* Deposition of Joshua Michaels ("Michaels Dep.") [ECF No. 47-1] at 78:1–3 ("Q. Tell me who your supervisor was when you worked [at Sasser's Glass]. A. Jeff Johnson.").

"[S]omewhere around the third week," Michaels and Johnson had a "verbal[ly] violen[t]" altercation about tools, Johnson Dep. 38:22–41:6, during which Michaels believed that "[Johnson] started trying to start a fight with [him]," Michaels Dep. 61:9–17. As tempers subsided, Johnson

---

evidence is undisputed. We thus rely on the Defendants' Statement of Undisputed Material Facts ("Defendants' SOF") [ECF No. 70]—and the depositions and affidavits of the Defendants' witnesses—*only* where the Plaintiff has failed to genuinely dispute a proposition the Defendants have asserted there. *See* S.D. Fla. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

[2] In a convoluted web of speculative conspiracy theory, Michaels claims that Johnson wanted to hire him (and then fire him) as a way of threatening Michaels's brother (Justin), who had been called, as a Sasser's employee, to testify in an unrelated case—about another Sasser's employee who had died on the job. *See* Deposition of Joshua Michaels ("Michaels Dep.") [ECF No. 47-1] at 128:1–7 ("[L]ike I said, he [Justin Michaels] was going -- they made -- they asked him to come to court. It was court ordered to go find out what happened to James and why he died on his job -- on Jeff Johnson's job site. And they didn't like that my brother did that, so they tried to erase me out of there to show my brother what they would do to him."). But Michaels never explains how he would know of any of this—nor even what evidence he has to support this wild theory.

"started trying to be nice, trying to pan stuff over and ease stuff over," but Michaels just "wanted to leave." *Id.* at 80:23–81:4. Seeing how upset Michaels was, Johnson remarked: "Oh, come on we're both hotheads here." *Id.* at 81:6. During that post-altercation conversation, Johnson "asked [Michaels]" what "he [was]" and why he had "dark hair and dark features." *Id.* at 103:10–13; *see also id.* at 103:21–22 ("[H]e said that -- that one day he wanted to fight me, he said that afterwards."). Michaels answered that he was "part Pennacook Indian" and "kind of [a] mix of other stuff," *id.* at 103:13–14, to which Johnson replied: "[Y]ou're one of those mountain niggers," *id.* at 103:15–16.

At some point between Michaels's third week of employment (the same week as the altercation) and his fourth (when he was fired), "[some] lady" "requested" that Michaels take a reduced wage—from $20 an hour to $16. *Id.* at 72:14–17. Here's how Michaels remembers this sequence of events:

> Q. Okay. But you told him that [you were Indian] after he was already harassing you, right?
>
> A. No, he said that -- that one day he wanted to fight me, he said that afterwards.
>
> Q. Okay. But that was after they had asked you to take $16 and after you already weren't getting along, right?
>
> A. No, that was before.
>
> Q. He asked you -- you told him you were Indian before they asked you to take the pay cut?
>
> A. Yeah. I guess I wasn't worthy of 20 bucks because I'm a Native American Indian[.]

*Id.* at 103:19–104:7. Michaels refused the pay cut. *See id.* at 77:19–21 ("Q. Ultimately they never cut your pay, right? A. No, because I refused it. I told them no, I don't think so.").

At some point "after" the altercation with Johnson (during the third week of his employment), Michaels "stopped working with [Johnson] and started working" with a new crew. *Id.* at 81:17–24; *see also* Sheri Johnson Aff. ¶ 10 ("Following an argument with Jeff Johnson, [Sasser's Glass] transferred Michaels to work on a crew with Dwayne Morris[.]"); Sheri Dep. 28:9–13 ("Q. And when you say they redirected Joshua Michaels to go with Dwayne, who did the redirecting? A. It was either Tanya

[Pender] or Lloyd [Pender], and they, you know, asked me about it and that was the only position that we had at that time for him."). Michaels testified that he and his brother were "kicked . . . off" the glazier job, *see* Michaels Dep. 81:17–24, and that they were sent, instead, "to go [work] out in [a] field [to] fabricate frames in the sun"—with "[n]o water . . . [j]ust fabrication," *id.* at 86:6–8. Before the Michaels brothers were transferred, though, Johnson appeared at the jobsite with two black men and asked another worker (in Michaels's presence): "'Which slave do you want?'" *Id.* at 102:18–19; *see also id.* at 102:21–25 ("Because they said they were going to get two guys to work over here to replace us. I'm like what the hell, man. So they were going to get two niggers to replace us they said. They asked [another worker there] which slave do you want[?]").

"On his [last] day, October 9, 2020," Defendants' Statement of Undisputed Material Facts ("Defendants' SOF") [ECF No. 70] ¶ 14, Michaels quarreled with his new supervisor, Dwayne Morris—whom (Michaels alleges) is also "a racist person," Michaels Dep. 60:1–9. When Michaels requested a transfer to a different crew, he was fired. *See id.* at 89:4–18 ("I said, I do not want to work with that guy. . . . Call me tomorrow and try to find a position where I can work somewhere where I'm not going to be angry or mad or around these people. . . . They said, 'okay, yeah, yeah.' I went home and no one called me for four days. I kept calling -- I called, called, called. . . . I texted Lloyd, what's going on. . . . They never called me back. And that was it."); *see also id.* at 90:8–14 ("Q. And why was he not calling you back? A. I don't know. They did not want me to work there in the first place. . . . They got me in there to fire me to show my brother what they are going to do to him.").

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14,

2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

### ANALYSIS

We analyze Michaels's claims—whether under § 1981, the FCRA, or Title VII—under the same legal framework. *See Pouyeh v. Bascom Palmer Eye Inst.*, 613 F. App'x 802, 809 (11th Cir. 2015) ("We have explained claims brought under § 1981 and the FCRA need not be analyzed separately from Title VII claims, based on the same conduct."); *see also Gant v. Kash'n Karry Food Stores, Inc.*, 390 F. App'x 943, 945 (11th Cir. 2010) ("Claims under both § 1981 and the FCRA are analyzed under the same framework as Title VII."). In Section I, therefore, we'll address whether Title VII or the FCRA even apply in this case (they don't). In Section II, we'll adjudicate Michaels's race-discrimination claim under § 1981 (Count I). And, in Section III, we'll consider the viability of his § 1981 retaliation claim (Count II). As we'll see, for one reason or another, none of Michaels's claims survive.

### I.      Sasser's Glass is Not an Employer Under Title VII or the FCRA (Counts III–X)

As a threshold matter, we agree with the Defendants that "[Michaels] cannot meet his burden of establishing coverage for [the] Defendant [Sasser's Glass] under Title VII or the FCRA" because, "at all relevant times," Sasser's Glass "did not employ . . . 15 or more employees in each of 20 or more calendar weeks in the current or preceding calendar year." MSJ at 4.

"The term 'employer' [in Title VII] means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person[.]" 42 U.S.C. § 2000e(b).

And the FCRA says basically the same thing: "'Employer' means any person employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person." FLA. STAT. § 760.02(7). "Simply put, Title VII is only applicable to individuals employed by an employer with fifteen or more employees." *Mousa v. Lauda Air Luftfahrt, A.G.*, 258 F. Supp. 2d 1329, 1334 (S.D. Fla. Mar. 31, 2003) (Moreno, J.) (cleaned up); *see also Copley v. Bax Glob., Inc.*, 80 F. Supp. 2d 1342, 1345 (S.D. Fla. Jan. 26, 2000) (Highsmith, J.) ("Because Title VII applies only to employers with 15 or more employees, § 1981 provides the only refuge under federal law from race-based employment discrimination by those who hire fewer than 15 employees." (quoting *Fadeyi v. Planned Parenthood Ass'n of Lubbock*, 160 F.3d 1048, 1049 (5th Cir. 1998)). In other words, if Sasser's Glass didn't employ fifteen or more workers in each of twenty (or more) calendar weeks in 2019 or 2020, Michaels's Title VII and FCRA claims fail.

Unfortunately for Michaels, only one witness discussed these *two* critical elements of any Title VII and FCRA claim—fifteen employees for twenty or more weeks. And that witness was Sheri Johnson, a "part owner of" Sasser's Glass who "make[s] all the hiring and firing decisions for" the company. Sheri Johnson Aff. ¶ 2. And Ms. Johnson was clear that Sasser's Glass "did not employ 15 or more employees for more than 20 weeks in either 2019 or 2020, excluding [herself] and co-owner, Jeff Sasser[.]" *Id.* ¶¶ 4–5.[3] Trying to parry this testimony, Michaels directs us to two other pieces of evidence—both unavailing.

---

[3] The Defendants here are wrong to suggest that, by virtue of their status as co-owners, Sheri Johnson and Jeff Sasser shouldn't count towards the fifteen-employee requirement. As one of our wisest colleagues has observed, "the Supreme Court has rejected this stringent interpretation"—*viz.*, that "an owner cannot be an employee as a matter of law"—when the Court "determine[ed] whether physician-shareholders of a professional corporation were considered employees under the ADA's same 15-employee numerosity requirement." *Barr v. Kelsey/95 Corp.*, 2021 WL 3239511, at *4 (S.D. Fla. July 29, 2021) (Singhal, J.) (citing *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 450 (2003)). And this seems right. The Supreme Court, in fact, has "expressly authorized the payroll method as the primary measure of determining the existence of an employment relationship." *Vazquez v. Melamed*, 598 F. App'x 760, 760 (11th Cir. 2015) (citing *Walters v. Metro. Educ. Enter., Inc.*, 519 U.S. 202, 207

*First*, Michaels points to Jeff Johnson's deposition for the proposition "that [Sasser's Glass] has 15 workers at all relevant times." Response at 2; *see also id.* at 16 ("At deposition, part-owner Defendant Jeff Johnson stated that there were fifteen employees at [Sasser's Glass]. This contradicts his wife, Sherry [sic] Johnson's affidavit. Triable issues of fact therefore exist."). Two problems with this. *One*, Johnson never actually said that the company employed fifteen or more people. In response to the question "[w]ould you say there were more than 20 people who worked for Sasser's Glass when Joshua Michaels --" Johnson answered: "No." Johnson Dep. 95:17–19. When the lawyer followed up by asking "[m]ore than 15?" Johnson said: "Maybe 15." *Id.* at 95:20–21. Johnson—who isn't in charge of hiring and firing in any event—thus *never* said that there *were* fifteen employees at the company. He simply speculated that "maybe" there were. And Johnson's speculation on this point cannot contradict the unambiguous testimony of the woman who *was* in charge of hiring and firing (Sheri Johnson). *See, e.g., Fernandez v. Hotwire Commc'ns, Ltd.*, 2022 WL 4598638, at *13 (S.D. Fla. Sept. 30, 2022) (Altman, J.) ("[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (quoting *Cordoba v.*

---

(1997)). Under that test, what "most readily demonstrate[s]" the employment relationship is "the individual's appearance on the employer's payroll." *Walters*, 519 U.S. at 202. For two reasons, though, this clarification doesn't save Michaels here. *One*, as we'll see in a moment, he's produced no evidence that the company *ever* employed fifteen or more people—with or without the owners on payroll—because Jeff Johnson's speculation that the company had "maybe 15" employees isn't evidence of anything. And it was indisputably Michaels's burden to prove this element of his claim. *See Bouey v. Orange Cnty. Serv. Unit*, 673 F. App'x 952, 954 (11th Cir. 2016) ("The plaintiff is responsible for proving that there is the threshold number of employees for the application of Title VII." (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006))); *see also Barr*, 2021 WL 3239511, at *4 ("A plaintiff, however, must do more than just assert in conclusory fashion that an employer has more employees than those listed on the payroll; the plaintiff must produce evidence to support her claim."). *Two*, as we'll explain, Michaels has produced absolutely no evidence—nor has anyone else—for his view that Sasser's employed fifteen or more people *for twenty or more weeks*, as the statutes unambiguously require. *Cf. Vazquez*, 598 F. App'x at 761 ("Although Vazquez argued that OCSU actually employed more individuals than those listed on its payroll, he failed to produce any evidence in support of this claim. Vazquez's conclusory assertion that OCSU employed more than 15 employees cannot save the day.").

*Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (cleaned up))); *Wills v. Walmart Assocs., Inc.*, 592 F. Supp. 3d 1203, 1220 n.6 (S.D. Fla. Mar. 21, 2022) (Altman, J.), *appeal dismissed sub nom. Marcellus Wills v. Walmart Assocs. Inc*, 2022 WL 2821277 (11th Cir. June 17, 2022) ("[S]peculation isn't enough to survive summary judgment."); *Harrell v. City of Opa-Locka*, 2022 WL 898565, at *20 (S.D. Fla. Mar. 28, 2022) (Altman, J.) ("[A]t summary judgment, a plaintiff must produce *evidence* to support her contention[s.]").

Two—and more importantly—there's *no evidence* that Sasser's Glass ever employed fifteen or more employees "each working day in each of twenty or more calendar weeks in the current or preceding calendar year," as both Title VII and the FCRA require. *See* 42 U.S.C. § 2000e(b); *see also* FLA. STAT. § 760.02(7). And, at summary judgment, the plaintiff must adduce evidence to prop up his claims. *See Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989) ("Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment."); *Celotex*, 477 U.S. at 323–24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."). Trying to find that evidence, Michaels directs us to paragraph 5 of the Defendants' Responses to his Interrogatories. *See* Response SOF ¶ 2 (disputing the Defendants' contention that Sasser's Glass didn't employ fifteen or more employees for twenty or more weeks in either 2019 or 2020 by citing "Response to Interrogatories #5"). But (as relevant here) that Interrogatory Response says only this: "payroll records from 2019 to the present produced in response to [the] Plaintiff's First Request for Production Number 35." Defendants' Objections and Answers to the Plaintiff's First Set of Interrogatories ("ROG Responses") [ECF No. 104-3] ¶ 5. And that's a problem because Michaels failed to include those payroll records anywhere. They're not on the docket, *see generally* Docket, or in an attachment to Michaels's Response, *see generally* Response, or even in any of the exhibits to Michaels's SOF, *see generally* SOF. Again, at summary

judgment, the parties must produce *evidence* for their positions. Since Michaels doesn't have the evidence he says he relied on, he cannot show that Sasser's Glass ever employed fifteen or more workers *for twenty or more weeks* and, therefore, cannot survive summary judgment. *See, e.g., Cendan v. Sch. Bd. of Broward Cnty., Fla.*, 2022 WL 4131105, at *10 (S.D. Fla. Sept. 12, 2022) (Altman, J.) ("But *no* evidence isn't enough to support an inference—let alone to survive summary judgment." (citing *Cordoba*, 419 F.3d at 1181)); *Breaux v. NCL (Bahamas) Ltd.*, 2022 WL 2304254, at *8 (S.D. Fla. June 24, 2022 (Altman, J.) ("*No* evidence (it goes without saying) isn't enough to withstand summary judgment."); *Nat'l Health Fin. DM, LLC v. Sea Spine Orthopedic Inst., LLC*, 2022 WL 2065045, at *8 (S.D. Fla. June 8, 2022) (Altman, J.) ("And no evidence isn't enough to survive summary judgment."); *Schultz v. Am. Airlines, Inc.*, 449 F. Supp. 3d 1301, 1317 (S.D. Fla. Jan. 3, 2020) (Altman, J.), *aff'd*, 855 F. App'x 656 (11th Cir. 2021) ("[A] plaintiff's untethered speculation is insufficient to survive a properly supported motion for summary judgment.").[4]

Because Michaels has presented *no* evidence for his view that Sasser's Glass qualifies as an "employer" for purposes of Title VII and the FCRA, we **GRANT** the MSJ as to all claims arising under those two statutes (Counts III–X).[5]

---

[4] And we cannot simply *assume* that these payroll records—wherever they are—would have shown what Michaels claims they show. After all, Sheri Johnson—who answered the Interrogatories, *see* ROG Responses at 15, and who "make[s] all the hiring and firing decisions" for Sasser's Glass, Sheri Johnson Aff. ¶ 2—also unambiguously attested that Sasser's Glass "did *not* employ 15 or more employees for more than 20 weeks in either 2019 or 2020," Sheri Johnson Aff. ¶¶ 4–5 (emphasis added).

[5] Two more things. *One*, the Defendants separately argue that Michaels hasn't "exhaust[ed] his administrative remedies" because his "multiple EEOC charges never assert that [Sasser's Glass] discriminated against him for being Native American or perceived as African American." MSJ at 5. As the Defendants rightly point out, this argument only applies to Michaels's "discrimination" and "retaliation in the workplace" claims. *See ibid*. Now that we've disposed of Michaels's Title VII and FCRA claims, however, the only extant discrimination and retaliation claims are the ones Michaels has asserted under § 1981. *See* TAC ¶¶ 41–62 ("[(Count I)] Race Discrimination in Violation of [42 U.S.C. § 1981]" and "[(Count II)] Retaliation in Violation of [42 U.S.C. § 1981]"). And, "[u]nlike Title VII, § 1981 does not require that a plaintiff exhaust administrative remedies before filing an action in federal court." *Green v. Elixir Indus., Inc.*, 152 F. App'x 838, 841 (11th Cir. 2005) (citing *Caldwell v. Nat'l Brewing Co.*, 443 F.2d 1044, 1046 (5th Cir. 1971)); *see also Grimes v. Bd. of Regents*

## II.      Race Discrimination Under § 1981 (Count I)

"'Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts.'" *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (first quoting *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999); and then citing 42 U.S.C. § 1981). "[A] plaintiff may prove race discrimination through either direct or indirect evidence." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012). Michaels's discrimination claim fail under either method.

### a.   Direct Evidence

"Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018). "To be direct evidence, the remark must indicate that the employment decision in question was motivated by race." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227–28 (11th Cir. 2002). The Eleventh Circuit has explained that "'only the most blatant remarks, whose intent could be nothing other than to discriminate on the protected classification' are direct evidence of discrimination." *Id.* at 1227 (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (cleaned up)); *see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (same).

---

*of Univ. Sys. of Ga.*, 650 F. App'x 647, 650 (11th Cir. 2016) ("Plaintiffs are not required to exhaust administrative remedies before bringing a § 1981 claim." (cleaned up)); *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975) ("Further, it has been noted that the filing of a Title VII charge and resort to Title VII's administrative machinery are not prerequisites for the institution of a [§] 1981 action." (collecting cases)). Since we've entered judgment against Michaels on his Title VII and FCRA claims, therefore, we needn't address this argument.

   *Two*, Michaels contends that the "Defendants seek to prove [their] affirmative defense to the hostile work environment, retaliation[,] and discrimination claim that was established in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)." Response at 17. And (he insists) this *Faragher* defense only applies to his hostile-work-environment claims because the Defendants are "legally precluded from proceeding" with this defense against "discrimination and retaliation claims." *Ibid.* And that's true: The *Faragher* defense "applies only to employer liability based upon a hostile environment theory." *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1246 (11th Cir. 2004). But Michaels's hostile-work-environment claims arose under Title VII and the FCRA. Since we've gotten rid of those claims, we needn't address the *Faragher* defense's application to our case.

Since direct evidence of discrimination "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption," any "remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Morgan v. Kalka & Baer LLC*, 750 F. App'x 784, 787 (11th Cir. 2018) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). Direct evidence would include, for instance, "a frank admission from a manager that he refused to hire an applicant because he was black." *Schwers v. Best Buy, Inc.*, 132 F. App'x 322, 324 (11th Cir. 2005) (quoting *Cooper v. S. Co.*, 390 F.3d 695, 724 n.15 (11th Cir. 2004)).

Michaels hasn't cleared this high bar here. Michaels (unwisely) rests his entire direct-evidence claim on the mistaken view that racial slurs *alone* constitute direct evidence of discrimination. As he sees it: "The use of racial slurs by a manager is an example of direct evidence of discrimination." Response at 11. But that's not the law. To count as direct evidence of discrimination, a racist slur must be "made in the context of [the Plaintiff's] termination." *Addison v. Ingles Markets, Inc.*, 515 F. App'x 840, 842 (11th Cir. 2013). Indeed, the Eleventh Circuit has repeatedly said that, unless "statements [were] made during the decision-making process, the statements are *not* direct evidence of age discrimination." *Jones v. BE&K Eng'g Co.*, 146 F. App'x 356, 359 (11th Cir. 2005) (emphasis added); *see also Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 F. App'x 936, 940 (11th Cir. 2010) ("A biased statement, separate in time from the employment decision under challenge, is not direct evidence of discrimination.").

What's worse, Michaels never actually tells us which specific statements he's relying on. That's because, in his view, the racial slurs in question "do not need to be repeated." Response at 11. But "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). To survive summary judgment, therefore, a plaintiff must point to the *specific* pieces of evidence in the record that (to his mind) create a genuine dispute of material fact. *See, e.g., RLI Ins.*

*Co. v. Alfonso*, 2021 WL 430720, at *7 (S.D. Fla. Feb. 8, 2021) (Altman, J.) ("Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to come forward with specific facts showing there is a genuine issue for trial." (cleaned up)); *A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1337, 1351 (S.D. Fla. Mar. 25, 2021) (Altman, J.) ("[T]o survive summary judgment, the plaintiff must adduce some evidence of damages—something concrete with which a reasonable jury can do more than guess at a 'mere conclusion' from the 'highest level of abstraction.'" (quoting *Anderson v. Am. Family Ins. Co.*, 800 F. App'x 814, 816 (11th Cir. 2020))); *see also* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by: . . . citing to *particular* parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials[.]" (emphasis added)). And Michaels has very plainly failed to do that here.

But here's the thing: On our independent review of the record, there *really* are only two racist slurs that *might* have supported Michaels's claim. And, unfortunately for Michaels, neither constitutes direct evidence of discrimination. The first obvious place to look is Michaels's deposition, where he alleged that Johnson called him a "mountain nigger." In Michaels's words: "[Johnson] goes, how come he has dark hair and dark features? I said, I'm part Pennacook Indian and I'm kind of [a] mix of other stuff. And he didn't like that. He's like you're one of those mountain niggers. That's what he told me." Michaels Dep. 103:12–17. The second came later—when Johnson had brought in two black workers to replace Michaels and his brother (Justin). As Michaels remembers the conversation, Johnson turned to the other works at the jobsite and asked: "[W]hich slave [referring to the two black men] do you want?" *Id.* at 102:1–20. These statements are awful and reprehensible, and we (in no way) condone them.

But, repugnant though they may be, both comments "clearly fall[ ] short of the type of evidence that this Circuit has recognized as direct evidence of discrimination." *Carter v. City of Miami*,

870 F.2d 578, 582 (11th Cir. 1989) (cleaned up). That's because "remarks that are not *tied* to a challenged employment decision . . . do not qualify under our definition of direct evidence of discrimination." *Robertson v. Riverstone Cmtys., LLC*, 849 F. App'x 795, 801 (11th Cir. 2021) (emphasis added). And, by Michaels's own admission, neither remark was "made in the context of [his] termination." *Addison*, 515 F. App'x at 842. According to Michaels's timeline, Johnson offered the first statement on the day he threatened to fight Michaels, *see* Michaels Dep. 103:21–22 ("No, he said that ['you're one of those mountain niggers'] -- that one day he wanted to fight me, he said that afterwards.")—which was about a week before Michaels was fired, *see* Johnson Dep. 40:7–10 (suggesting that the altercation occurred "somewhere around the third week" of Michaels's four-week tenure); *see also* Michaels SOF ¶ 7 (not disputing that he worked at Sasser's for about four weeks and never identifying when, in that four-week span, the altercation with Johnson occurred). Johnson made the second remark some time[6] before Sasser's Glass transferred Michaels to his new crew. *See* Michaels Dep. 102:10–19 ("I guess they replaced me and Justin with these two black ironworkers. That's why they are asking 'which slave do you want[.]'"); *see also* Jeff Johnson Aff. ¶ 8 ("After this argument with Michaels, [Sasser's Glass] transferred Michaels to work with a different crew with installer Dwayne

---

[6] We say "some time" because Michaels has refused to tell us *when* each of these events occurred. Here's how Michaels frames this timeline in his Response:

> Here, Plaintiff provides the following evidence. Defendant Jeff Johnson was a supervisor and he threw apart Plaintiff's tools . . .[u]sed racial epitaphs [sic] in Plaintiff's presence to describe other African American people . . . challenged Plaintiff to a fight and called Plaintiff numerous racial epitaphs [sic] that do not need to be repeated. . . . Plaintiff was moved to a different crew . . . demoted to helper . . . Johnson inquire[d] which crew members wanted . . . slaves . . . . When Plaintiff was unable to work under the conditions that were placed upon him after being demoted to a helper, Defendant Lloyd Pender . . . terminated said Plaintiff. This was all part of Defendant Jeff Johnson's plan with respect to Plaintiff.

Response at 12. Two things emerge from this mish-mashed chronology—both relevant to our analysis. *One*, the person who made the offensive comments (Johnson) didn't fire Michaels. *Two*, Michaels was fired some days *after* the offensive slurs were made.

Morris rather than me."). This (again) was either a week or two before Michaels, who would later quarrel with his new supervisor, was fired. *See* ROG Responses ¶ 19 ("Based on the foregoing [altercation with Johnson], [Sasser's Glass] removed Plaintiff from this project and placed Plaintiff with another service crew where Plaintiff was not required to bring his own tools. . . . ***After a couple of weeks*** of performing poorly, in October 2018 [sic], Plaintiff once again became enraged in response to receiving instructions, this time from Mr. Morris." (emphasis added));[7] Johnson Dep. 40:7–10 (suggesting that the altercation with Johnson occurred "somewhere around the third week" of Michaels's four-week tenure); *see also* Defendants' SOF ¶ 14 ("On his final day, October 9, 2020, Plaintiff argued with and swore at Morris in front of customers.").[8] Since Michaels hasn't even tried to suggest that these challenged "statements [were] made during the decision-making process, the statements are not direct evidence of [ ] discrimination." *Jones*, 146 F. App'x at 359; *see also Williamson*, 372 F. App'x at 940 ("A biased statement, separate in time from the employment decision under challenge, is not direct evidence of discrimination.").

And that's particularly true in a case like ours—where it's undisputed that the person who made the offensive comments *didn't* fire the plaintiff. *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) (explaining that "statements by nondecisionmakers" cannot constitute direct evidence of discrimination); *Ritchie v. Indus. Steel, Inc.*, 426 F. App'x 867, 872 (11th Cir. 2011) ("The other discriminatory remarks identified by [the plaintiff] do not constitute direct evidence because they were not made by the decision makers."); *Morrison v. City of Bainbridge*, 432 F. App'x 877,

---

[7] Again, Michaels never challenges the Defendants' claim that he was fired about a week or two after the racist comments were made. Indeed, as we've seen, he doesn't give us any meaningful timetable at all.

[8] In his Response SOF, Michaels marks this assertion as "Disputed"—but only because he wants to make clear that "Plaintiff disagrees with statement #14 in [that] the Plaintiff was terminated by Defendant Pender." Response SOF ¶ 14. He thus never disputes the proposition that he was fired *only after* he quarreled with his second supervisor (Morris). Indeed, as we'll discuss more fully below, Michaels admits that he was fired *after* he yelled profanities at Morris. *See* Michaels Dep. 88:3–15.

880 (11th Cir. 2011) (noting that "remarks by non-decisionmakers . . . are not direct evidence" of discrimination). Michaels, remember, "was terminated by Defendant [Lloyd] Pender." Michaels's SOF ¶ 14 ("Disputed. Plaintiff disagrees with statement #14 in that Plaintiff was terminated by Defendant [Lloyd] Pender." (first citing Michaels Dep. 145:21–146:7; and then citing Deposition of Tanya Pender ("Tanya Pender Dep.") 13:1–14:18)); *see also* Response at 4 ("Upon complaining of the working conditions, Plaintiff was terminated by Lloyd Pender." (citing Response SOF ¶ 62 ("Lloyd Pender terminated Plaintiff from his employment.")))). Because Pender never made the objectionable statements—and since the racist slurs were not said in the context of termination—those statements cannot constitute direct evidence of discrimination.

One more thing on this before we move on: Because the alleged wrongdoer (Johnson) and the decisionmaker (Pender) are two different people, Michaels *could've* tried to develop a "cat's-paw" theory of discrimination. "Pursuant to the cat's-paw theory, a defendant may be held liable for the racial animus of its non-decisionmaking employee when . . . that employee's discriminatory conduct causes a decisionmaking employee to take an injurious action against the plaintiff." *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1298 (11th Cir. 2021). Of course, Michaels hasn't cited *Ziyadat* (or any other similar case); indeed, he never even mentions the "cat's-paw" theory at all, *see generally* Response—which is reason enough to stop here, *see Watts v. Club Madonna, Inc.*, 784 F. App'x 684, 690 n.5 (11th Cir. 2019) ("'Taking appellant's contention [that the court should consider arguments the non-movant *didn't* make at summary judgment] to its logical conclusion would render the summary judgment process an exercise in futility, and would place the onus on the district court to distill any possible argument which could be made based on the materials before the court. Presenting such arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court[.]'" (quoting *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))); *see also Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily

complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). Michaels (it's true) *does* speculate that "[t]his—referring to his termination at Pender's hands—"was all part of Defendant Jeff Johnson's plan with respect to Plaintiff." Response at 12. But he has no evidence for this proposition. And (again), even if he did, he never references—much less cites authority for—the "cat's-paw" theory of discrimination. *Cf. Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed [forfeited].").

Having determined that Michaels has produced no *direct* evidence of discrimination, we note that courts in our Circuit routinely refuse to "give great weight . . . to language that is, at best, only circumstantial evidence" because, to do otherwise, would be to "blur[] the important distinction between circumstantial evidence and direct evidence for prima facie cases." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998). Indeed, faced with far more damning evidence, the Eleventh Circuit has repeatedly cast aside claims of direct discrimination. *See, e.g.*, *Scott*, 295 F.3d at  1227–28 (no direct evidence of discrimination, even where supervisor said "[w]e'll burn [the plaintiff's] black ass," because that statement was "too remote" and did "not directly relate[ ] to the subject of [the plaintiff's] termination"); *Morgan*, 750 F. App'x at 788 (no direct evidence of discrimination, even where the named partner of the plaintiff's firm said he did not like "Black people" and "that's why they're in the back of the office," because "these remarks and others like them were unrelated to the decisionmaking process"); *Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 888 (11th Cir. 2013) (no direct evidence of discrimination, even where the decisionmaker told the plaintiff she "should go back to the night shift" to "be with her own kind," because "the 'your own kind' statement does not prove race or gender discrimination without inference"); *Carter v. Three*

*Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (no direct evidence of discrimination, even where the decisionmaker admitted that she had "a bias against blacks" and that "she found that they were difficult for her to trust or get along with," because those statements "could have been expressing a desire to get past such prejudices" and "the statement does not relate directly to the [challenged employment] decision").

Ultimately, "the quintessential example of direct evidence would be a management memorandum saying, 'Fire Earley—he is too old.'" *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1190 (11th Cir. 1997) (cleaned up); *see also Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 931 (11th Cir. 1995) ("Indeed, a statement that members of a racial minority in general or women in general are simply not competent enough to do a particular job would seem to be a classic example of direct evidence."). But we don't have a "Fire Michaels—he's a Native American" here. Nor does Michaels ever suggest that Johnson (or anyone else) said anything like "Native Americans can't do this job, get rid of them." Because none of Johnson's statements establish—without inference or presumption—that Michaels was terminated for a discriminatory purpose, they cannot serve as direct evidence of discrimination.[9]

---

[9]     Michaels could've argued that the racist comments he was subjected to were so "flagrant, revolting, and insulting" (and "widespread") that "racial hostility *permeated* [Sasser's Glass's] managerial ranks." *Robertson*, 849 F. App'x at 803 (emphasis added). He could've claimed, in other words, that the "'overwhelming evidence of racial hostility'" in the company's managerial ranks "constitute[s] direct evidence of discriminatory intent[.]" *Ibid.* (quoting *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1072 (11th Cir. 1990)). But he never *really* makes this argument—which is reason enough to disregard it. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d at 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed [forfeited].").

        The closest he comes is one line from his deposition, in which he facilely opines that "everyone" at Sasser's Glass "is racist[.]" Michaels Dep. 141:10–13. But simply saying that someone is "racist" isn't nearly the same thing as showing, *with proof*, that the company fired you for discriminatory reasons. Were it otherwise, any civil-rights plaintiff could, without evidence of any kind, survive summary judgment in every case by alleging that everyone at the defendant-company was racist. The law doesn't work that way. And, as we've highlighted, the only *evidence* Michaels has proffered of racism at the company are Johnson's comments—which, limited as they are to one man,

### b. Circumstantial Evidence

"A plaintiff can establish intentional discrimination through circumstantial evidence in two ways." *Dukes v. Shelby Cnty. Bd. of Educ.*, 762 F. App'x 1007, 1011 (11th Cir. 2019). *First*, the employee can "satisfy[ ] the burden-shifting framework set out in *McDonnell Douglas*." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). *Second*, the employee can "demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at 1221 n.6 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Michaels expressly disclaims any reliance on *McDonnell Douglas*—and he never even hints at any mosaic theory—so his discrimination claims fail under either framework.

### i. *McDonnell Douglas*

Here's what Michaels has to say about *McDonnell Douglas*:

> Defendant in its motion devotes a lengthy discussion of the *McDonnell Douglas* burden shifting rules and, following it, states Plaintiff cannot meet is [sic] burden. **This is not the test under these facts**. Rather, in this case, Plaintiff's discrimination is predicated upon direct evidence of discrimination. Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. As the Court of Appeals held: In cases of discrimination proved by direct evidence, **it is incorrect to rely on the *McDonnell Douglas* test** because, while circumstantial evidence is used to create an inference of discrimination under *McDonnell Douglas*, no such inference is required in the case of direct evidence.

Response at 11 (emphasis added & cleaned up). That's really the end of that. *See, e.g.*, *Campbell*, 26 F.4th at 872 ("[W]aiver is the intentional relinquishment or abandonment of a known right. . . . Waiver

---

do not indicate that "racial hostility *permeated* [Sasser's Glass's] managerial ranks." *Robertson*, 849 F. App'x at 803. Our case, then, reminds us of *Robertson*, where the Eleventh Circuit rejected a direct-evidence discrimination claim because there was no evidence that "the three *other* individuals . . . who collaborated on the decision to terminate Robertson used derogatory language or created an environment of racial hostility[.]" *Robertson*, 849 F. App'x at 803 (emphasis added). In our case, for instance, Michaels is clear that Pender fired him. *See* Response at 4 ("Upon complaining of the working conditions, Plaintiff was terminated by Lloyd Pender." (citing Response SOF ¶ 62 ("Lloyd Pender terminated Plaintiff from his employment."))). But he's adduced *no evidence whatsoever* for the view that Pender is racist or that Pender ever directed racist comments towards him—much less that Pender did so in the context of his termination.

directly implicates the power of the parties to control the course of the litigation; if a party affirmatively and intentionally relinquishes an issue, then courts must respect that decision.").

### ii.   Convincing Mosaic

"As an alternative to the *McDonnell Douglas* burden-shifting test, a plaintiff can survive summary judgment by presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Holley v. Ga. Dep't of Corr.*, 845 F. App'x 886, 890 (11th Cir. 2021). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (cleaned up). A convincing mosaic "may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (cleaned up).

As we've seen, however, Michaels has relied *only* on a direct-evidence theory in his papers. He, indeed, has *never* claimed that this case presents a "convincing mosaic" of discrimination. He's thus waived any such claim. *See Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."); *Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed [forfeited].").

*  *  *

Since Michaels has failed to produce evidence for either a direct or an indirect claim of discrimination, we **GRANT** the MSJ as to Count I.

### III.     The Retaliation Claim Under § 1981 (Count II)

Unlike what he did with his discrimination claim, Michaels never argues that he's produced direct evidence of retaliation. *See generally* Response. "Where, as here, there is only circumstantial evidence of retaliation, we use the burden-shifting framework of *McDonnell Douglas*[.]" *Tyler v. Kia Motors Mfg. Ga., Inc.*, 702 F. App'x 945, 949 (11th Cir. 2017) (applying *McDonnell Douglas* to a retaliation claim under Title VII and § 1981); *see also Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009) ("Absent direct evidence of discrimination, when analyzing claims for race-based retaliation brought under § 1981, we employ the tripartite analytical framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."). And, indeed, in defending his retaliation claim, Michaels jumps right into the first step of the *McDonnell Douglas* test—though (as we'll see) that's the only step he examines. *See* Response at 13 (referring to the "familiar three-part test as it relates to retaliation claims").

Under the *McDonnell Douglas* test, the plaintiff must first make out a *prima facie* case of retaliation by showing: "(1) that [he] engaged in statutorily protected activity, (2) that [he] suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (cleaned up). If he manages to do that, "[t]he burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action." *Id.* at 1135. Finally, "[i]f the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the proffered reason was merely a pretext to mask [retaliatory] actions." *Ibid.* (cleaned up).

We'll explain in a moment why we think Michaels's claim fails at *McDonnell Douglas*'s first step. But we pause here to point out that we'd have granted the MSJ as to the retaliation count anyway—

that is, *even* if Michaels had passed the first step—because, for reasons that remain unclear, he never even tries to suggest that he's satisfied the second and third steps. And this omission is particularly glaring given that the Defendants specifically analyzed each of *McDonnell Douglas*'s three steps in their MSJ. *See* MSJ at 6–14 (first arguing that the "Plaintiff . . . cannot demonstrate that [the] Defendants retaliated against him," then contending that, "[e]ven if [the] Plaintiff could establish a *prima facia* case of discrimination or retaliation," the Defendants have proffered "a legitimate, non-discriminatory/non-retaliatory reason for their employment conduct to defeat Plaintiff's claims," and finally insisting that, Michaels has failed to "come forward with evidence that each reason is pretextual"). Michaels has thus unambiguously waived any arguments he could've made under those second and third steps. *See Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."); *Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed [forfeited].").

Waiver aside—and at the risk of drifting somewhat far afield—Michaels would've been hard-pressed to prevail on the second or third steps anyway. That's because Michaels admitted at his deposition that he yelled profanities at his supervisor *in front of other people*. Here's how that part of the deposition went down:

> Q: So you ended up getting into an argument with Wayne [sic] Morris, right?
> A: Yeah.
> Q: And you screamed profane language at him?
> A: Yes, I did.
> Q: What did you say then?
> A: I said -- I said you're dumb mother fucker -- I said you're an aggravating stupid asshole, man. I said fuck you, I told him, man.
> Q: And were there other people that overhead that?

A: I don't know. I'm sure there was. There were five other people in there.

Michaels Dep. 88:3–15.

Needless to say, this kind of aggressive behavior towards a coworker plainly constitutes a legitimate, race-neutral reason for Michaels's termination (the second *McDonnell Douglas* step). "The defendant's burden [at this second step]," after all, "is one of production, not persuasion, and is 'exceedingly light.'" *Cotton v. Enmarket Inc.*, 809 F. App'x 723, 725 (11th Cir. 2020) (quoting *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988)); *see also Wills*, 592 F. Supp. 3d at 1234–35 ("At this stage, 'the burden shift[s] to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action.' Here, the employer bears only a 'burden of production'" (quoting *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006))); *Barthlow v. Jett*, 303 F. App'x 723, 724 (11th Cir. 2008) (finding it "clear that [the employer] had a legitimate reason for firing [the plaintiff]" because the plaintiff's "file contain[ed] numerous reprimands for abusive and harassing incidents with co-workers"); *Gaston v. Home Depot USA, Inc.*, 129 F. Supp. 2d 1355, 1372 (S.D. Fla. 2001) (Gold, J.) ("It is beyond question that an inability to get along with co-workers and demonstrated caustic or rude behavior is a legitimate, nondiscriminatory reason for an employment decision." (quoting *Garcia-Cabrera v. Cohen*, 81 F. Supp. 2d 1272, 1280–81 (M.D. Ala. 2000))).

And, since Michaels has produced no evidence for the proposition that the Defendants' reliance on this profanity-laced tirade was mere pretext for discrimination, he'd likewise fail the third step of *McDonnell Douglas*. "To avoid summary judgment the plaintiff must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination. A reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (cleaned up). At this third step, "'[t]he plaintiff must meet the reason proffered head on and rebut it.'" *Versfelt v. Sanza Food Serv., LLC*, 2022 WL 479881, at *15 (S.D. Fla. Feb. 16, 2022) (Altman, J.) (quoting

24

*Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007)); *see also Chandler v. Ga. Dep't of Behav. Health & Dev. Disabilities*, 861 F. App'x 296, 300 (11th Cir. 2021) ("When an employer articulates more than one legitimate, non-retaliatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." (cleaned up)). "An employee can do this by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find all of [the employer's] reasons unworthy of credence.'" *Versfelt*, 2022 WL 479881, at *15 (quoting *Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998)). As we've repeatedly said, the law doesn't require businesses to employ workers who abuse their coworkers—especially in front of others. *See*, *e.g.*, *Wills*, 592 F. Supp. 3d at 1249 (noting that, at the third step, a plaintiff fails to meet his pretext burden when he concedes that he behaved abusively: "Are we really prepared to say that [the employer] cannot protect[] its [] employees from abusive managers like [the plaintiff]?"); *Versfelt*, 2022 WL 479881, at *15 ("Are we really prepared to say, in the face of all this, that a company cannot fire an employee who's *this* toxic?"). All of this means that—however much Michaels can satisfy the first step of *McDonnell Douglas*—his retaliation claim necessarily fails because he's produced no evidence (or argument) for the second and third steps.

But Michaels hasn't satisfied that first step because he hasn't shown that he engaged in statutorily protected activity. Section 1981 ensures "that all persons regardless of their race have the same right 'to make and enforce contracts.'" *Hayes v. ATL Hawks, LLC*, 844 F. App'x 171, 183–84 (11th Cir. 2021) (quoting 42 U.S.C. § 1981(a)). To "'make and enforce contracts' for purposes of § 1981 is defined as 'the making, performing, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Ibid.* (quoting 42 U.S.C. § 1981(b)). "Therefore, to state a claim for retaliation pursuant to § 1981, the protected activity must have been the type that § 1981 was enacted to prevent *i.e.*, racial discrimination

in the making and enforcement of contracts." *Stephen v. H. Lee Moffitt Cancer Ctr. & Rsch. Inst. Lifetime Cancer Screening Ctr., Inc.*, 259 F. Supp. 3d 1323, 1341 (M.D. Fla. May 3, 2017) (Honeywell, J.) (citing *Moore v. Grady Meml. Hosp. Corp.*, 834 F.3d 1168, 1176 (11th Cir. 2016)).

"To state a retaliation claim under § 1981," therefore, "a plaintiff must allege a defendant retaliated against him *because* the plaintiff engaged in statutorily protected activity." *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1311 (11th Cir. 2010) (emphasis added) (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008)). "As with other statutory retaliation claims, such a claim under § 1981 requires that the protected activity involve the assertion of rights encompassed by the statute." *Ibid.* (first citing *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998); then citing *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004); and then citing *Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir.2001)). Michaels thinks he engaged in "statutorily protected activity" in two ways: *first*, by "cho[osing] not to fight Defendant Jeff Johnson after a barrage of racial insult[s] were launched [at him]"; and *second*, by "complain[ing] about the attempted pay-cut[.]" Response at 14. Neither can sustain his retaliation claim.

*First*, Michaels cites no law for his view that his refusal to fight Johnson qualifies as protected activity under § 1981. The law is well-settled that "[p]erfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived." *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009); *see also U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) ("We will not address this perfunctory and underdeveloped argument."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed [forfeited]."); *Belony v. Amtrust Bank*, 2011 WL 2297669 (S.D. Fla. June 8, 2011) (Marra, J.) (noting that a party's failure to cite authorities for a proposition "makes it difficult for the Court to rule in its favor"). And "a skeletal argument" won't do. *United States v. Esformes*, 60 F.4th 621, 635 (11th Cir. 2023) ("We have long held that an appellant

abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." (quoting *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014))). Or, as we observed in a similar context:

> The law demands that lawyers present their clients' cases with argument and citation. It doesn't—nor should it—permit lawyers to fling whatever arguments they might conjure (however far-fetched or frivolous) at the judge in the hopes that, by a prodigious use of a Westlaw account, that intrepid judge (and his smart law clerk) might find the one case that stands in support of their proposition.

*MY. P.I.I. LLC v. H&R Marine Eng'g, Inc.*, 544 F. Supp. 3d 1334, 1346 (S.D. Fla. 2021) (Altman, J.).

But here's the rub: Having now done our own research on the subject, we've found no support for Michaels's claim that his refusal to fight Johnson qualifies as statutorily protected activity under § 1981. And that makes sense. Recall that a retaliation claim under § 1981 must be predicated on the kinds of protected activities § 1981 "was enacted to prevent *i.e.*, racial discrimination." *Stephen*, 259 F. Supp. 3d at 1341. But Michaels *specifically denied* that the fight with Johnson had anything to do with racial animus. *See* Michaels Dep. 61:12–17 ("Q. Jeff started to fight with you because of your race? A. *No*, he started to throw my tools around and provoke a fight with me and called me out to the parking lot." (emphasis added)). Our Circuit has been clear on this point: "As with other statutory retaliation claims," it has said, "such a claim under § 1981 requires that the protected activity involve the assertion of rights encompassed by the statute." *Jimenez*, 596 F.3d at 1311. Since the fight had nothing to do with racial animus, Michaels's refusal to fight couldn't have "implicat[ed] any rights protected by § 1981"—and, as a result, Michaels's refusal to fight "cannot form the basis of his § 1981 retaliation claim." *Ibid.*

 *Second*, Michaels hasn't shown that he complained about the attempted wage cut *to anyone*. Michaels is right that "an employee's complaint about discrimination constitutes protected activity if the employee could reasonably form a good faith belief that the alleged discrimination existed." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (cleaned up); *see also Bolton v. Baldwin Cnty. Pub.*

*Sch.*, 627 F. App'x 800, 803 (11th Cir. 2015) ("Protected activities include the filing of a formal complaint, the voicing informally of a complaint to superiors, or the use of an employer's internal grievance procedure to report alleged discrimination." (citing *Rollins v. State of Fla. Dep't of L. Enf't*, 868 F.2d 397, 400 (11th Cir. 1989)). But Michaels *admitted* that he never complained about any of the alleged misconduct to anyone. *See* Defendants' SOF ¶ 22 ("Plaintiff never complained to [Sasser's Glass] about any of the alleged harassing conduct."); Response SOF ¶ 22 ("Undisputed. Plaintiff agrees with statement #22."). He thus cannot claim that he "complain[ed] about the attempted pay-cut," Response at 14, as a way of propping up his retaliation claim now. *See, e.g., McCroden v. Cnty. of Volusia*, 724 F. App'x 768, 771 (11th Cir. 2018) ("Although we review the evidence in the light most favorable to McCroden (the non-moving party), we do not accept his version of the facts when obviously contradicted by the record." (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007))); *Versfelt*, 2022 WL 479881 at *8 n.8 ("Again, we won't allow Versfelt's lawyer to fill in the holes Versfelt himself dug in the evidence.").

Because Michaels hasn't produced any evidence for his view that he engaged in a statutorily protected activity—and since his brief wholly ignores the second and third *McDonnell Douglas* steps—we **GRANT** the MSJ as to Count II.

\*      \*      \*

After careful review, we **ORDER AND ADJUDGE** that the Defendants' MSJ [ECF No. 102] is **GRANTED** as to all Counts.

**DONE AND ORDERED** in the Southern District of Florida on March 17, 2023.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**